# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KATRINA BURLET, | ) |
| Plaintiff, | ) |
| v. | ) No. 18 CV 05875 |
| JOHN BALDWIN, in his official capacity and individual capacities, and GLADYSE TAYLOR, in her individual capacity, | ) Judge John J. Tharp, Jr. |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Visitors to prison do not leave their constitutional rights along with their personal belongings at the entrance. Katrina Burlet alleges that Illinois Department of Corrections (IDOC) officials—John Baldwin, Director of IDOC, and Gladyse Taylor, Assistant Director of IDOC—cancelled her debate program at Stateville Correctional Center and banned her from all IDOC facilities simply because they disagreed with the message her program conveyed. This, she argues, violated her constitutional rights under the First Amendment and the Due Process Clause. Burlet further alleges state law defamation against Baldwin for his comments to the media following the cancellation and ban. In response, the IDOC defendants have moved to dismiss Burlet's claims under Rule 12(b)(6). Because the Court finds that Burlet has plausibly alleged a First Amendment violation but has failed to state a claim for defamation, the motion is denied in part and granted in part.

# BACKGROUND[1]

Katrina Burlet is a successful college debater turned debate coach. Compl. ¶¶ 1, 10, ECF No. 1. She currently teaches debate at her alma mater, Wheaton College, as well as at Hinsdale Central High School. *Id.* ¶¶ 10-11 In October 2017, she was approved by IDOC officials to begin volunteering as a debate teacher at Stateville Correctional Center. *Id.* ¶ 18. The class members—14 in total—were all serving long prison sentences and, a few weeks into the class, they decided to focus on parole as a debate topic. *Id.* ¶¶ 18-19. Parole was personally significant to the class members and they believed it was an important matter of public policy. *Id.* ¶ 20. After practicing on the subject, Burlet and the class made plans to hold a debate on parole that would be open to select members of the public. *Id.* ¶ 22. Specifically, the class planned to invite state legislators and other individuals that they believed would be interested in the topic. *Id.* ¶ 23. Burlet sought and obtained approval from IDOC officials to hold the debate, which was scheduled to take place on December 15, 2017. *Id.* ¶ 24.

In obtaining approval and preparing for the event. Burlet "was careful to follow all IDOC rules and protocols of which she was made aware." *Id.* ¶ 25. For example, Burlet provided a list of attendees to IDOC on October 13, more than 60 days prior to the event. *Id.* ¶ 26. Subsequently, on November 30, IDOC issued an official gate pass for all the scheduled attendees, including nine state legislators. *Id.* ¶ 27. On December 4, however, Stateville's Warden notified Burlet that the event had been cancelled by Michael Lane, the Chief of Intergovernmental Affairs for IDOC. *Id.* ¶ 28. Lane purportedly "needed 10 days' notice" to clear the legislators to attend the debate. *Id.*

---

[1] As with all motions to dismiss, the Court must accept all well-pleaded facts in the Complaint as true and draw all permissible inferences in favor of the plaintiffs. *Agnew v. NCAA*, 683 F.3d 328, 334 (7th Cir. 2012).

¶ 30. Burlet, however, believed the justification was pretext: she had supplied the listed names 60 days in advance of the debate and, at the time of cancellation, Lane still had enough time (11 days) to clear the legislators. *Id.* ¶¶ 31-34.

Despite the cancellation, Burlet and IDOC officials worked to reschedule the event. *Id.* ¶ 36. In rescheduling, Burlet was once again careful to comply with all known Stateville requirements. *Id.* ¶ 35. The rescheduled debate was held on March 21, 2018, with eighteen members of the Illinois General Assembly in attendance. *Id.* ¶¶ 36, 37. Burlet provided opening remarks and facilitated a debate between four class members. *Id.* ¶ 38. The participants "examined the relative advantages and disadvantages of different systems for implementing parole in Illinois." *Id.* ¶ 39. The debate was followed by a question and answer session and a meet and greet opportunity during which the legislators engaged seriously with the class members, asking thoughtful questions and expressing interest in their ideas. *Id.* ¶¶ 40-41.

Early reviews of the debate were positive. *Id.* ¶ 42. The class members' self-image and spirits were buoyed by meaningful communication with policymakers, the legislators expressed interest in continuing the conversation about parole, and several IDOC officials congratulated Burlet and members of the team on a successful event. *Id.* ¶¶ 43-46. Encouraged by the response, Burlet made plans to re-create the debate in front of Stateville prisoners on April 26, 2018. *Id.* ¶ 47. Upon Burlet's request, IDOC agreed to record the debate, thereby making it available to a wider audience outside of the prison. *Id.* Looking to expand the program, Burlet also arranged for her class to host a debate with Wiley College, a highly rated college debate team. *Id.* ¶ 48.

Despite the generally positive reception, not everyone was happy with the debate. *Id.* ¶ 49. On April 3, defendant Gladyse Taylor, Assistant Director of IDOC, appeared unannounced at a regularly scheduled class session and expressed dissatisfaction with the class, particularly its

3

chosen debate topic. *Id.* ¶ 49. Taylor did not want the class voicing its views on parole to the state legislators: IDOC had its own legislative agenda and it did not need "legislators thinking about this issue, [it] just need[ed] them to give [it] [ ] money." *Id.* ¶¶ 50-51. Taylor told the class that its message was inconsistent with her own personal policy initiatives within IDOC and that she had warned a legislator not to introduce legislation without IDOC's perspective or else Taylor would "get" the legislator. *Id.* ¶ 52-53. Taylor then directed her "veiled threats" to the class, implying that she could move the inmates to less desirable IDOC institutions should she be implicated in any lawsuits. *Id.* ¶ 54. At a meeting nearly two weeks later, on April 16, Taylor told Burlet that IDOC needed to "control the message" conveyed by the debate team to state legislators, and suggested other, more palatable topics. *Id.* ¶ 55.

Burlet was subsequently informed that the April 26 debate was cancelled, the Wiley College debate was cancelled, and that she was banned from all IDOC facilities. *Id.* ¶ 58. Following these cancellations, the entire class signed an "Open Letter" to then-Governor Rauner, which Burlet hand delivered to the Governor's office on May 26, 2018. *Id.* ¶ 62. The letter and its delivery garnered some media coverage and, in a June 21 interview on the subject, defendant Baldwin, then-Director of IDOC, told an NPR reporter that the class was cancelled because Burlet "chose not to follow basic corrections safety and security practices." *Id.* ¶¶ 64-65.

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant

4

is liable for the misconduct alleged." *Id.* A plaintiff does not need "detailed factual allegations," but must plead more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Determining whether a complaint plausibly states a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Although Burlet's complaint forwards various theories of liability, the factual allegations contain two claims: first, a claim that IDOC, with Taylor and Baldwin's involvement, impermissibly cancelled her program's debates and banned her from all IDOC facilities; second, a claim that Baldwin unlawfully damaged her reputation when he spoke to the media.

**I. Cancellations and Ban**

As to the first claim, Burlet's complaint includes several counts setting forth legal theories under which she contends that the defendants are liable to her in connection with the termination of the debate team—a First Amendment theory of liability, a First Amendment retaliation theory of liability, and a Due Process theory of liability—but complaints plead claims, not legal theories. *See ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016) ("Complaints plead claims, which is to say grievances."). Here, the events supporting these counts are properly considered as part of the same claim: each count references the same actors—Taylor and Baldwin—and the same operative facts—the debate on parole, Taylor's criticisms of the class generally and Burlet specifically, and IDOC's subsequent cancellation of future debates and ban of Burlet. *See NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) ("One set of facts producing one injury creates one claim for relief, no matter how many laws the

5

deeds violate.").² As explained below, the Court finds that the cancellations and ban plausibly infringed on Burlet's First Amendment rights; therefore, the Court need not consider the viability of Burlet's alternate theories of liability arising from these events.³

To survive the motion to dismiss on her First Amendment theory, Burlet's complaint must plausibly allege that: (1) her constitutional rights were violated; (2) Taylor and Baldwin were personally involved in the violation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003) ("[Section] 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim."). Taylor and Baldwin dispute both issues; in the alternative, they argue that the doctrine of qualified immunity requires dismissal.

Burlet's claim stems from IDOC's decision to cancel her program's debates and ban her from all IDOC facilities. To assess whether a prison regulation or policy decision infringed on the constitutional rights of a visitor,⁴ courts ask whether the regulation or policy at issue was "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987)

---

² The potential factual predicates need not be precisely the same: for example, only a retaliation theory would include Burlet's outside of prison actions and Baldwin's interview within the relevant conduct. At this stage, however, the Court need not differentiate between facts relevant under all theories and facts relevant under some theories. The question for a given claim is whether any set of facts permit a reasonable inference of liability under any theory. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").

³ Burlet brings her claim against Taylor in her individual capacity and against Baldwin in his individual and official capacities. The motion to dismiss does not independently address the requirements of official capacity liability, however, and the Court limits its analysis to individual capacity liability. Because both the individual and official capacity claims survive the motion, the Court substitutes the current Director of IDOC, Rob Jeffreys, for Baldwin in his official capacity. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (substituting current warden).

⁴ The test is "the same whether the rights of prisoners or of nonprisoners are at stake." *Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9).

(establishing the test in the context of prison regulations); *see also Siddiqi v. Leak*, 880 F.2d 904, 909 (7th Cir. 1989) (extending the *Turner* test to prison policy decisions). Reviewing prior precedent, the *Turner* Court outlined four factors relevant to the reasonableness inquiry: (1) whether there is a valid, rational connection between the prison policy and a neutral, legitimate government interest; (2) the existence of alternative means of exercising the constitutional right; (3) the impact that accommodation of the asserted right will have on other inmates, guards, and the allocation of prison resources; (4) whether the regulation was an exaggerated response to prison concerns. 482 U.S. at 89-90. As relevant here, courts have applied *Turner* (or its antecedents) to assess the validity of regulations constraining the First Amendment rights of outsiders to access prisons and communicate with prisoners. *See e.g. Pell v. Procunier*, 417 U.S. 817, 827 (1974) (finding, under an earlier standard, that "security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates"); *Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989) (stating that publishers "have a legitimate First Amendment interest in access to prisoners" and assessing regulations of incoming mail under the *Turner* test); *Am. Civil Liberties Union Found. v. Spartanburg Cty.*, No. 7:17-CV-01145-TMC, 2017 WL 5589576, at *4 (D.S.C. Nov. 21, 2017) (assessing ACLU attorneys' First Amendment right to solicit clients under the *Turner* test).

Nonetheless, defendants attempt to avoid the *Turner* test altogether by contending that Burlet has no "First Amendment right to enter a maximum security prison to teach a program to the prisoners there." Reply Supp. Mot. Dismiss at 1, ECF No. 33. While correct in one regard—Burlet has no "right" to teach the class—the contention misunderstands the nature and scope of First Amendment protections. Even where "a person has no 'right' to a valuable government

7

benefit and the government can withhold a benefit for any number of reasons, '[i]t may not deny a benefit to a person on a basis that infringes . . . constitutionally protected interests—especially . . . freedom of speech.'" *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 535 (7th Cir. 2006) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). Here, Burlet alleges that Taylor and Baldwin restricted her speech due to her views on parole; and it is "axiomatic" that viewpoint discrimination is an impermissible basis for government action. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. . . . Discrimination against speech because of its message is presumed to be unconstitutional."). The prison context requires a special analysis, but if IDOC's actions cannot be justified under *Turner*, they infringed upon Burlet's constitutionally protected interest in free speech; that the infringement came in the context of a "benefit" rather than a "right" is of no import.

In prisons, as elsewhere, restrictions of speech based solely on the message conveyed are impermissible. *See Thornburgh*, 490 U.S. at 415 ("[The prison's] practice in question must further . . . [a] governmental interest unrelated to the suppression of expression.") (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)); *Turner*, 482 U.S. at 89-90 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."). "Neutrality" does not require prison officials to avoid content-based distinctions "unrelated to the suppression of expression." *Martinez*, 416 U.S. at 415. For example, regulations that distinguish "between publications solely on the basis of their potential implications for prison security" are neutral in the relevant sense. *Thornburgh*, 490 U.S. at 415. Practices that invite the suppression of "'inflammatory political,

8

racial, religious or other views' and matter deemed 'defamatory' or 'otherwise inappropriate,'" however, are not. *Martinez*, 416 U.S. at 415.

Burlet's allegations, taken as true, easily state a plausible claim that Taylor was motivated by illegitimate viewpoint discrimination. Given that the debate class went forward without incident and with the approval of the institution, it is reasonably inferable that the teaching debate class and the conduct of formal debates themselves did not provide reason for Taylor or other IDOC officials to pull the plug on Burlet's work. It was only after Burlet conducted a debate on parole policy, before an audience including a substantial number of state legislators, that Taylor intervened. At that point, Taylor allegedly told Burlet, in no uncertain terms, that she disapproved of the class's views on reinstating parole in Illinois and that its communication with state legislators must halt. Burlet was, according to the complaint, quite transparent about her motivations—the class's advocacy was getting in the way of IDOC's, and Taylor's, legislative agenda. These motivations are "decidedly not neutral"—Taylor plainly sought to further "personal prejudices and opinions" through the "suppression of expression." *Thornburgh*, 490 U.S. at 416 n.14 (quoting *Martinez*, 416 U.S. at 415).

On the current record, it is certainly plausible that Taylor's impermissible motivations—not "legitimate penological interests"—were the operative factors in the cancellations and ban. *Turner*, 482 U.S. at 89. The only evidence of an alternative, legitimate explanation is Baldwin's brief statement, made during an NPR segment, that Burlet "chose not to follow basic corrections safety and security practices." Compl. ¶ 65. The defendants argue that this alone puts them on safe ground under the *Turner* test. Mem. Sup. Mot. Dismiss at 9-10, ECF No. 18 ("Revoking Plaintiff's prison access and cancelling the debate program is thus reasonably related to the government interest of maintaining institutional security. The goal of maintaining institutional security is

paramount to all other legitimate penological objectives."). But this just sets up a fact dispute about why the debate program was terminated; that question will have to be resolved after discovery by means of a trial; that IDOC officials maintain that Burlet was barred because she breached some as-yet-unknown security protocol does not provide a basis to conclude that the complaint fails to state a plausible claim.

Defendants also contend that Burlet has failed to plead Taylor and Baldwin's personal involvement. Although Burlet cannot say who ultimately issued the relevant orders shutting down the debate program, the record permits a reasonable inference that both Taylor and Baldwin were personally involved. As for Taylor, her comments pre-dating the cancellations and ban support such a finding. Taylor articulated her desire to end the dialogue on parole that Burlet and her class had started and made it clear—by recounting the statements she made to the senator and implying that she could re-locate inmates as punishment—that she was willing to take action to achieve her goal. It is certainly plausible that she took alternative means—namely, the actions at issue here—to accomplish her ends. The allegations indicating Baldwin's involvement, on the other hand, come from after, not before, IDOC's cancellations and ban. In the NPR interview, Baldwin's statements communicate personal ownership over the actions at issue, permitting an inference that he was involved in, or at least consulted about, the decisions. Unlike *Iqbal*, where defendants were implicated by their positions within an organizational chart rather than by any particular conduct, Burlet's complaint pleads Taylor and Baldwin's involvement in non-conclusory—even if non-conclusive—ways. 556 U.S. at 680-81. The well-pleaded facts of Taylor's pre- and Baldwin's post-ban comments "nudge[ ] [Burlet's] claim[ ] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. That is all that is required at this stage.

10

As an alternative ground for dismissal, Taylor and Baldwin contend that they cannot be held liable due to qualified immunity. Qualified immunity applies when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citation omitted). "[T]he rule that qualified immunity must be resolved at the earliest possible stage . . . must be tempered by the notice pleading requirements of Rule 8." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) (internal citations omitted). On a Rule 12(b)(6) motion, therefore, resolution of a case on qualified immunity grounds is "inappropriate" where application of the doctrine "depends on the facts of the case." *Alvarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001); *see also Ewell v. Toney*, 853 F.3d 911, 920 (7th Cir. 2017) (noting that where qualified immunity is "a factual question" it is "better reserved for summary judgment"). As discussed above, even in the prison context, the First Amendment right to be free from viewpoint discrimination is clearly established. *See Thornburgh*, 490 U.S. at 415. Whether Taylor and Baldwin violated this clearly established right depends on the existence of an alternative motivation—a disputed factual question. As a result, Rule 12(b)(6) is a "mismatch" for qualified immunity in this case and resolution of the defense is premature. *See Alvarado*, 267 F.3d at 652 (quoting *Jacobs v. City of Chicago*, 215 F.3d 756, 775 (7th Cir. 2000) (Easterbrook, J., concurring)).

**II. Baldwin's Comments to the Media**

Burlet's defamation claim stems from Baldwin's statement, in the NPR interview, that the debate class was cancelled because Burlet "chose not to follow basic corrections safety and security practices." Compl. ¶ 65. To state a claim for defamation, the plaintiff must allege "facts showing that the defendant made a false statement about the plaintiff, that the defendant made an

11

unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). Here, the parties focus on the third element. A defamatory statement causes damages if it "harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id.* Certain statements, however, are deemed defamatory *per se* because they are "so obviously and materially harmful to a plaintiff that his injury may be presumed and he does not need to prove actual damages to recover." *Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005). *See also Owen v. Carr*, 497 N.E.2d 1145, 1147 (Ill. 1986) ("Language to be considered defamatory *per se* must be so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary."). Burlet argues that Baldwin's statement is actionable *per se*.

Under Illinois law, statements considered defamatory *per se* fall into five categories, two of which are relevant here. The first comprises "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties." *Green*, 917 N.E.2d at 459. The second extends to "words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Id.* These categories are typically considered in tandem to cover statements that relate to a plaintiff's "job performance"—either an accusation that plaintiff "lack[ed] ability in his trade" or did "something bad in the course of carrying out his job." *Cody*, 409 F.3d at 857.[5]

---

[5] It is unsettled whether—and if so, in which circumstances—comments made about a person's performance as an unpaid volunteer (Burlet's position at Stateville) can be the proper basis for a defamation *per se* action. *Compare, e.g, Muzikowski v. Paramount Pictures Corp.*, No. 01 C 6721, 2003 WL 22872117, at *5 (N.D. Ill. Dec. 3, 2003) (holding that defamation *per se* is available for a volunteer where the facts pleaded "could support the inference that [plaintiff's] volunteer efforts comprise a second profession"), *with King v. Armstrong*, 623 F. Supp. 487, 492 (N.D. Ill. 1985) ("[T]he harm accruing to a person who is defamed in a private endeavor, outside of the person's trade or business, is not obvious. The latter situation requires proof of damages.").

A statement impugning a plaintiff's personal, as opposed to professional, integrity does not fall within these categories unless "personal integrity" is so "intertwined with job skills" that no such distinction is tenable. *Id.* at 857-58; *see also Kumaran v. Brotman*, 617 N.E.2d 191, 199 (Ill. App. Ct. 1993) (holding that a newspaper article accusing a school-teacher of filing "scam" lawsuits was defamatory *per se* because, as a role model for students, the teacher's job duties included personal integrity).

Even where the subject matter of a statement falls within one of these categories, "it will not be actionable *per s*e if it is reasonably capable of an innocent construction." *Green*, 917 N.E.2d at 463. In evaluating the range of reasonable constructions, courts have stressed that "the context of the statement is critical." *Id.* To get the full context at the motion to dismiss stage, the Court "must consider not only 'the complaint itself,' but also 'documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.'" *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-1020 (7th Cir. 2013) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). Of particular relevance here is the remainder of the NPR segment at the center of Burlet's defamation claim. Immediately preceding Baldwin's statement about the safety protocols (the only portion included in Burlet's complaint), Baldwin stated: "The debate program was really well-received." Viewed in this context, an innocent construction of Baldwin's comments is available: Baldwin's words were not derogatory of Burlet's ability in her trade—he was complimentary of her as a debate coach—but indicated only that she was a poor fit for IDOC. Understanding criticisms as

---

The parties do not raise the issue in this case, however, so the Court assumes without deciding that Burlet's activities at Stateville fall within the relevant category.

directed to "fit" rather than "ability" is a well-recognized innocent construction of allegedly defamatory comments by employers. *See Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill. 1996) (collecting cases). In *Anderson v. Vanden Dorpel*, for example, the Supreme Court of Illinois determined that Anderson's past-supervisor's statements to a potential employer—that Anderson "could not get along with her coworkers" and "did not follow up on assignments"—were capable of an innocent construction—namely, that Anderson "did not fit in with the organization of the employer making the assessment and failed to perform well in that particular job setting." *Id.* at 1301-02. Baldwin's statements are substantially more complimentary than those at issue in *Anderson* and can easily be read to go to fit, not ability.

Burlet seeks to rule out this construction of Baldwin's statements by characterizing her profession as teaching debate and ministering in prisons rather than coaching debate more generally. *See* Pl.'s Resp. Mot. Dismiss at 19, ECF No. 29. Set against this vocational backdrop, Burlet argues, a statement that she did not follow safety protocols amounts to a general indictment of her ability because compliance with such protocols is necessary to work in most, if not all, prisons. Even taking Burlet's questionable premise as true—that her profession can be characterized as work in prisons—the argument fails. The fact that an employer's negative assessment of an employee's fit raises an inference that the employee might be a bad fit for other, similar organizations does not render the innocent construction unavailable. This is clear from the facts of *Anderson*. There, the criticisms at issue—an inability to get along with co-workers or follow up on assignments—go to basic requirements of many, if not most, jobs and potential employers would be justifiably skeptical of an employee who failed at such fundamental tasks. *See* 667 N.E.2d at 1302. Nonetheless, the court did not find defamation *per se*. *Id.* Potential impact on future job prospects, therefore, does not necessarily indicate that the statement targeted a person's

ability to do their job or is actionable *per se*. *Cf. Cody*, 409 F.3d at 858 ("Harris's accusations suggest that Cody lacks certain qualities desirable in an employee, and the accusations might indeed make it harder for Cody to get a job. But the increased difficulty in finding employment would be due to Cody's perceived bad character traits, not because of his perceived inability to do the job."). This is especially true where, as here, the comments are limited to the immediate organizational context and do not generalize about the employee's ability to perform in future opportunities. *See Kakuris v. Klein*, 410 N.E.2d 984, 987 (Ill. App. Ct. 1980) (finding no defamation *per se* where a past employer "expressed an opinion that plaintiff proved to be unsatisfactory in his role" but did "not impugn his abilities to function in an executive capacity for another employer at a future date"). In sum, Baldwin's statements, which praised Burlet's underlying ability as a debate coach and cabined criticisms to her activity in the IDOC context, are reasonably capable of an innocent construction and not actionable *per se*.

In the alternative, Burlet attempts to proceed under defamation *per quod*. *Green*, 917 N.E.2d at 461 ("[A] plaintiff can always avoid [the] heightened pleading standard by seeking to establish a defamation *per quod* claim rather than a defamation *per se* claim, as damages are not presumed in *per quod* claims."). In proceeding this way, however, Burlet encounters another obstacle: her complaint fails to plead damages with sufficient specificity. *Anderson*, 667 N.E.2d at 1303-04. The complaint alleges various harms: that defendants' actions "caused harm to Ms. Burlet's professional interests and reputation," Compl. ¶ 69; that "Baldwin's statements harmed" her, *Id.* ¶ 102; that "defendants' actions (Baldwin's false statements in particular) have also cast a

15

cloud over Ms. Burlet's reputation." *Id.* ¶ 76.[6] None of these allegations, however, describe the harm with the required specificity. *See Anderson*, 667 N.E.2d at 1303-04 (finding allegations that plaintiff "has been damaged monetarily by losing gainful employment" and "has suffered great mental pain and anguish" to be "[v]ague" and, therefore, insufficient).

Because she has not plausibly alleged defamation *per se* or adequately pleaded damages, the defendants' motion to dismiss Burlet's defamation claim is granted.

\* \* \*

For the reasons stated above, the defendants' motion to dismiss under Rule 12(b)(6) is denied in part and granted in part. The defendants' motion to dismiss is denied as to the plaintiff's claim and theories arising from the termination of the debate program at Stateville; their motion is granted without prejudice as to defendant Baldwin's comments regarding the plaintiff's failure to abide by basic security protocols. Plaintiff may file an amended complaint on or before May 15, 2020; this deadline is not subject to General Order 20-12 but the plaintiff may seek extension of this deadline by motion if additional time is needed in light of present circumstances.

Date: April 3, 2020

John J. Tharp, Jr.
United States District Judge

---

[6] In support of defamation damages, Burlet also cites to her allegation that "Justice Debate League has lost two of its most high-profile programs and contributions have declined." Compl. ¶ 71. But the Complaint attributes these consequences to "IDOC's decision to cancel the debate programs," not Baldwin's later statements. *Id.* Therefore, taking the Complaint's description as true, these allegations cannot be used to support damages resulting from Baldwin's later statements.