**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KATRINA BURLET, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-5875 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| JOHN BALDWIN, in his official and | ) | |
| individual capacities, and GLADYSE | ) | |
| TAYLOR, in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Katrina Burlet served as a volunteer at the Illinois Department of Corrections ("IDOC") Stateville Correctional Center from October 2017 to April 2018, teaching a debate class. In April 2018, IDOC officials discontinued the class and barred Burlet from all IDOC facilities statewide. Burlet claims that those actions were taken because the defendants in this case, Gladyse Taylor, then the Assistant Director of IDOC, and John Baldwin, then the Director of IDOC, did not approve of the topic the class chose to publicly debate: parole reform. Invoking 42 U.S.C. §1983, Burlet has sued Taylor and Baldwin,[1] alleging they violated her rights under the First Amendment, retaliated against her for exercising those First Amendment rights, deprived her of a protected liberty interest without procedural due process, conspired to violate her constitutional rights, and failed to intervene in these constitutional violations.[2] She seeks monetary damages as

---

[1] Defendant Baldwin was sued in his official and individual capacities; pursuant to Fed. R. Civ. P. 25(d), current IDOC Director Rob Jeffreys is automatically substituted for Baldwin for all official capacity claims.

[2] Burlet originally brought a state law defamation claim against defendant Baldwin, which the Court dismissed. *See* Mem. Op. and Order 16, ECF No. 48.

well as an injunction requiring the defendants to reinstate her debate programs and reverse the IDOC facilities ban.

The defendants now move for summary judgment. For the reasons that follow, the defendants' motion is granted.

## FACTUAL BACKGROUND[3]

In October 2017, Burlet started as a volunteer at the IDOC Stateville Correctional Center, a maximum-security prison in Crest Hill, Illinois. Defs.' L.R. 56.1 Statement of Undisputed Material Facts ¶¶ 1-2, ECF No. 98 (hereinafter, "DSOF"). Burlet, who had a background in collegiate debate, contacted Stateville's Senior Chaplain, George Adamson, about starting a debate class at Stateville. *Id*. ¶ 4; *see also* Compl. ¶ 10, ECF No. 1. Adamson and Burlet met shortly thereafter to discuss logistics, including a start date for the class, security procedures, volunteer agreements, and topics the class might debate. DSOF ¶¶ 6, 8. Adamson suggested parole reform as a topic; ultimately, that was the subject chosen by the class. *Id*. ¶ 7. Prior to the start of the class, Burlet attended an orientation session for Stateville volunteers and signed the Volunteer Services Agreement and Release, acknowledging: "I have agreed to serve as a volunteer at the sole discretion of the Illinois Department of Corrections." *Id*. ¶¶ 11-14.

*December 15, 2017 debate*

Adamson and Burlet agreed that the class should aim to have a public debate for a small audience, and chose December 15, 2017 as the date. *Id*. ¶¶ 15-16. The day the debate class began, October 3, 2017, Burlet was already planning the event, and emailed Adamson that she was planning to invite "law makers." Ex. 4 to DSOF 3, ECF No. 98-4. On November 27, 2017, Burlet emailed Adamson a "guest list" for the public debate, which included one state senator and eight

---

[3] Unless otherwise noted, the following facts are undisputed.

state representatives. Ex. 6 to DSOF 1, ECF No. 98-6. Adamson, in turn, forwarded that email to the Warden of Stateville, Randy Pfister, and the Assistant Warden of Programs, Darwin Williams, who apparently were surprised. *Id*. Pfister forwarded the list of names to the head of Intergovernmental Relations for IDOC, Michael Lane, who responded: "What's the debate? I'm leaning towards no because I knew nothing about it? Some of those listed are candidates for statewide office. I'm gonna need more info." *Id*. On November 29, Burlet sent a much longer guest list to Adamson, which included nine legislators and more than 40 other names. Ex. 7 to DSOF 1-3, ECF No. 98-7. Adamson again forwarded the list to Pfister and Williams, recommending that no outsiders be permitted to attend the debate, but rather that it be used as a "rehearsal" for a future public debate. *Id*.

In the meantime, still believing the December 15 debate would go forward as planned, Burlet made a request to videotape it. DSOF ¶ 25. On December 1, IDOC Communications Coordinator Lindsey Hess emailed Pfister that "[t]o get the written consent of that many offenders seems burdensome to me." Ex. 9 to DSOF 2, ECF No. 98-9. Pfister forwarded the note to Lane, telling him that Hess had denied the request, and continuing: "My personal opinion sir, is that this is a lot of Dignitaries in one [area]. Especially state officials…. With 75 Maximum security inmates. Doubt anything would happen, and I would ensure security is at it's [sic] best ….." *Id*. at 1. Lane forwarded the email to defendant John Baldwin, asking his approval to cancel the event because "[t]hey didn't do this the proper way and the warden doesn't think it's a good idea either." *Id*. Baldwin responded: "I do not have an issue cancelling this event. I would like to offer them another opportunity to conduct the debate after they follow normal procedures. I think the idea of a debate about PRB/parole would be very interesting. We would be inviting the PRB and others to attend." *Id*. Lane agreed, and stated he would try to have the event rescheduled at a later date. *Id*.

Apparently disappointed by this outcome, Burlet, on December 4, emailed Lane, asking how far in advance she needed to communicate with Stateville about future events, and what the "motivation" was for "keeping legislators out of prison," adding "it makes me feel like the prison has something to hide." Ex. 8 to DSOF 1, ECF No. 98-8. Lane replied that part of his job was approving or denying visits by legislators, and that "a process exists that I have to follow. I was notified of this event by a legislator last week. That is not the proper process and does not allow me the time to do what I need to do in order to get this done. I don't believe this was your fault and I apologize that it has happened this way. . . . I am working to correct this issue and I hope that we can schedule a similar event in the near future." *Id*. A few days later, Burlet vented to Adamson over email in strong terms, referring to the IDOC administrators as "a bunch of cowards." Ex. 10 to DSOF 1, ECF No. 98-10. Detailing conversations she had with Lane and Pfister in which they purportedly discussed the protocol for inviting legislators, Burlet concluded, "[t]hese people are infuriatingly obstinate (and, frankly, stupid)." *Id*. at 2.

Ultimately, the December 15 event went forward with a small audience of members of the general public, but no legislators. DSOF ¶ 29. There is no evidence of record suggesting that any IDOC or Stateville official objected to parole reform as the topic of the debate.

*March 21, 2018 debate*

After the December event, Burlet worked with Lane, Adamson, Pfister, and others to plan a second public debate for March 21, 2018. DSOF ¶¶ 34-35. On January 17, 2018, Burlet met with Pfister and Assistant Warden Williams to discuss the event. *Id*. at ¶ 36. In advance of that meeting, Lane told Pfister via email that Burlet could "invite any elected official she wants and we will find a way to accommodate. However the other 200 people need to be whittled down to 30 or less. It's a maximum facility prison. I think that number is manageable. It's a safety issue." Ex. 12 to DSOF

2, ECF No. 98-12. At that meeting, Pfister and Williams relayed those numbers to Burlet, and asked her to submit a proposal for the event. DSOF ¶¶ 37-39.

Afterward, Pfister emailed Lane and Hess that he believed Burlet was "naïve and [had] absolutely no sense of reality as far as this being a Maximum Security facility. … I personally think she will go to someone of a higher authority than me on this debate. She wants [m]edia, video cameras, etc… in for her debate. . . . I do support this [debate] very much, but I believe she is very passionate about making this a huge thing for her benefit." Ex. 12 to DSOF 2. At the meeting, Pfister had described to Burlet some of the more gruesome crimes committed by individuals incarcerated at Stateville, and Williams made comments about Burlet's persistence. Pl.'s L.R. 56.1 Statement of Material Facts ¶¶ 5-6, ECF No. 104 (hereinafter, "PSOF").

That evening, Burlet emailed Pfister with a lengthy "recap" of their discussion. Ex. 11 to DSOF 2, ECF No. 98-11.[4] Burlet listed her various requests for the debate, and issues they had discussed, including:

- Her need to communicate with Lane directly regarding any government officials she would invite.

- Whether a video camera could be cleared, which she wrote "was met with less than enthusiasm, so I was hindered from sharing most of my thoughts about it."

- Whether she could get permission to publish the class members' photos and bios on her website, and whether she could get their writings published.

- How media could be cleared for entry.

- Pfister's refusal to have music at the event.

---

[4] Burlet began this email with "a brief explanation for [her] seemingly apathetic attitude toward the fact that Stateville is a maximum security prison." Burlet stated that she had previously lived in the Philippines, "where rape and murder are commonplace and encouraged by the government" and in Turkey, "where there is no tolerance for religious diversity and the army and general public openly attack Christians." Ex. 11 to DSOF 2. Burlet told Pfister that as "a rather outspoken Christian … it is impossible for me to feel unsafe or nervous almost anywhere else." *Id*.

- Their agreement that she "no longer go on the galleries."

*Id*. at 2-3. Pfister testified that he recalled that many of these items were "things that she'd already been told [were] not going to happen." Pfister Dep. 87:4-6, Ex. 17 to DSOF, ECF No. 98-17. Pfister responded to the email: "I asked for your complete proposal. Not a review of our meeting today. That is what I expect." Ex. 11 to DSOF 2. Burlet responded by recasting her items as her requests for Pfister. One was: "That you send the following up the chain for approval: a video camera to record the event for historical records, for the inmate channel, and for the hundreds of people who are currently planning to attend this debate who you informed me today that we must deny entrance to." *Id*.

Burlet also started seeking the responses she was looking for elsewhere in the organization. On January 18, she sent an email to Patrick Simon, who worked with Lane in Intergovernmental Relations, stating that she "was told that the theater building in Stateville can hold 350 people, so I was limiting it to that many attendees. Am I thinking about this properly?" Pl.'s Resp. to DSOF ¶ 42, ECF No. 104; Ex. 14 to DSOF 1, ECF No. 98-14. The next day, Simon emailed Lane that "Katrina just called asking how many people she was allowed to invite to the debate." Ex. 15 to DSOF 1, ECF No. 98-15. Two weeks earlier, Hess had also learned that Burlet had independently spoken with a reporter at Injustice Watch about the March debate. DSOF ¶ 43.

Burlet's tactics frustrated Lane and Pfister. Pfister complained that Burlet was "playing . . . angles," and Lane expressed that he hoped IDOC officials would "pull the plug" on the event because Burlet was "obviously . . . not listening." Ex. 14 to DSOF 1.

Ultimately, the March 21, 2018 event did go forward, with Illinois legislators and members of the general public in attendance. DSOF ¶ 46. No media was permitted, a decision made by defendant Gladyse Taylor, the Assistant Director of IDOC, and other IDOC officials in part

because, Taylor testified, "we" (apparently IDOC) did not know anything about the subject matter of the debate. PSOF ¶ 7. The event was the first time Burlet met defendant Taylor, who welcomed the audience and introduced Burlet. DSOF ¶ 47. Like the December event, the debate topic was parole in Illinois, with the posed resolution: "The state of Illinois should establish a parole system to evaluate for release all current and future incarcerated people." *Id*. ¶ 48; Ex. 3 to DSOF 2, ECF No. 98-3. There is again no evidence of record that anyone at IDOC or Stateville objected to the parole reform topic. By all accounts, the debate was a success, and several IDOC employees, including Pfister, complimented both Burlet and the event itself. DSOF ¶ 48. Taylor testified that she greeted most of the legislators who attended, but did not discuss the content of the debate with them. Taylor Tr. 63:18-20, Ex. 3 to PSOF, ECF No. 105-3**.** However, she spoke with two members of the Prison Review Board who attended and told them that, in fact, parole already exists in Illinois, and what the debaters were really discussing were amendments to so-called "truth in sentencing" laws. *Id*. at 63:21–64:22.

Immediately following the debate, defendant Taylor and Burlet spoke privately. DSOF ¶ 52. Taylor expressed displeasure with how Burlet had gone about organizing the debate, and told her that the event had not been properly cleared, that IDOC Chief of Programs Dr. Anita Bazile-Sawyer should have been included in the process, and that in the future, Burlet needed to work with Bazile-Sawyer to schedule events. *Id*. ¶¶ 52-53. Up to that point, no other IDOC official had told Burlet she needed to clear events with Bazile-Sawyer. PSOF ¶ 11. During that conversation, Burlet invited Taylor to visit the debate class. DSOF ¶ 54.

On March 26, 2018, Burlet emailed Walter Nicholson, who by then had succeeded Pfister as Stateville's warden: "Representative Mayfield has asked me if she can return to Stateville and spend more time with the team. She said she could either come in on April 3 or May 1." Ex. 5 to

PSOF 1, ECF No. 105-5; DSOF ¶ 51. That request was forwarded to several IDOC officials, including Lane who said it was "fine . . . as long as its only her [sic]." Ex. 5 to PSOF 1. Taylor responded: "I hope she selects April 3rd. I want to be there when she comes and I had planned to be there [Stateville] on the 3rd to clarify some misinformation presented during the debate." *Id*. On March 30, Simon informed Taylor that Mayfield would visit on May 1. Ex. 7 to PSOF 1, ECF No. 105-7. Taylor responded, "I want to make sure Rep. Mayfield has a Department perspective. I don't need a separate meeting scheduled. I want to be there when she visits this group." *Id*.

On April 2, 2018, Burlet set about planning another event. She emailed Taylor, thanking her for attending the March debate and for the feedback she had provided. DSOF ¶ 55. She also told Taylor that she had submitted a "formal request to videotape a re-enactment of the debate" to the chaplain's office, Nicholson, Pfister, and Hess. *Id*. She also asked for Bazile-Sawyer's contact information, which Taylor provided. *Id*. ¶ 57. In her separate email to Adamson, Nicholson, and Pfister (though in fact not Hess), Burlet wrote that the reenactment had been scheduled for Thursday, April 26 and "[t]he hope is that we will be allowed to disseminate the video to members of the Illinois General Assembly who wanted to attend but were unable." Ex. 21 to DSOF 1, ECF No. 98-21. She made no mention of the debate's subject matter. That email was forwarded to Taylor, Lane, and IDOC Chief of Operations Sandra Funk. *Id*. Funk replied, without explanation, "I say no," and Pfister (by then a Deputy Director for IDOC) agreed. *Id*.; DSOF ¶ 51.

*Defendant Taylor's April 3, 2018 visit to the debate class*

On April 3, 2018, while Burlet was teaching the debate class, defendant Taylor visited with Nicholson and another IDOC official. DSOF ¶ 60. During that visit, Taylor told the class that IDOC wanted its programming to be "evidence-based," meaning that it had been studied and shown to have specific outcomes such as reducing recidivism, and that the debate class was not

evidence-based because it had not been studied for its effects on recidivism rates. *Id*. ¶ 61. Taylor explained that IDOC also had to prioritize its legislative initiatives over the debate program, telling the debate class that they could reenact the March 21 debate, but the Department wanted to "get through this legislative session first." PSOF ¶ 19. As she left the classroom, Taylor raised her voice and said that she did not want to see her name in any lawsuits. *Id*. ¶ 22.

The next day, Burlet sent an email to Adamson, summarizing Taylor's visit. Ex. 22 to DSOF 1, ECF No. 98-22. While she wrote that Taylor "said some things that were neutral and some things that were complimentary of the debate," Burlet proceeded to list several statements she claims Taylor made during the visit. *Id*. In Burlet's account to Adamson (which is largely consistent with Burlet's testimony on the topic), Taylor stated that she did not want to let the debate class film the debate because "they" (IDOC, presumably) did not want the General Assembly hearing it, as they had a budget to get passed and they didn't want legislators thinking about the parole issue. *Id*. Burlet further wrote that Taylor told the class that she had spoken with a Representative Mayfield at the debate and told Mayfield that she should not introduce any legislation she did not have the department's perspective on, because she (Taylor) would "get" her (Mayfield) if she did. *Id*. Burlet also wrote that Taylor said she could "say this class is not evidence-based and shut it down at any time." *Id*. During Burlet's deposition, she testified that Taylor plainly told the class, "I don't like that parole was discussed at the debate" and that Taylor wanted her policy ideas to be front of mind for legislators rather than parole reform. Burlet Tr. 108:5-9, 109:2-4, Ex. 2 to DSOF, ECF No. 98-2. Taylor talked, Burlet testified, about needing money for necessities such as toilet paper and underwear, and about how she had been working on some of the policies the inmates had discussed during the debate for helping evaluate individuals for parole, for which Burlet thought Taylor seemed to want "credit." *Id*. at 109:14-18, 110:8-16. Adamson

9

testified that three separate members of the debate team told him that Taylor had visited the class and didn't appear to like what was happening with it, and that they "didn't know if they were going to make it." PSOF ¶ 28.

For her part, Taylor testified that when she visited the class that day, the men shared with her concerns about the facility, such as a lack of cleaning supplies, toiletries, and the fact that they weren't getting rotations of undergarments. Taylor Tr. 66:16-24. She told them that the department had requested supplemental appropriation from the Illinois General Assembly. *Id*. at 67:1-6. They also discussed the assessments being developed for evaluating inmates for different security classifications, an issue related to parole. *Id*. at 67:14-25. The class told Taylor they wanted to do a reenactment of the debate, with legislators present. *Id*. at 68:10-14. She responded that they could do so, but said "let's get through this legislative session first" in light of the supplemental appropriation request pending before the general assembly. *Id*. at 68:15-25. Taylor estimated that in early April, there would have been about 60 days remaining in the legislative session. *Id*. at 70:2-4. Taylor recalled discussing evidence-based programming, but did not recall discussing what programs might have to be cut as a result of implementing evidence-based programming. *Id*. at 72:12-15. Taylor also did not recall discussing any interactions she had with legislators on the day of the debate. *Id*. at 72:19-25.

After the visit, Taylor followed up with Simon regarding Representative Mayfield's upcoming visit: "I was with this class this morning. I may have a scheduling conflict for May 1st. I believe they will share what they choose to share. They asked the Department to allow them to tape a reenactment of the debate. I informed them today not at this time. We will see what the Rep. comes away with." Ex. 7 to PSOF 1.

10

The next day, April 4, Burlet emailed Adamson, Nicholson, and another chaplain at Stateville requesting, again, to videotape a reenactment of the parole debate on April 26, 2018. PSOF ¶ 30; Ex. 10 to PSOF 2, ECF No. 105-10. This was forwarded to Taylor, who replied: "I met with Katrina yesterday and informed her not now. So the official response is No. She sent this request immediately following my visit. Her next step is to be removed from the facility. As I explained to her and this point was raised during the debate; this is not an evidence based program and therefore should not be consuming program space." Ex. 10 to PSOF 2. Bazile-Sawyer responded, "[u]pon further notice & due to limited program space/program priority, this program should be discontinued (no new offenders slated after graduation)." PSOF ¶ 34. Taylor replied: "This is not an evidence based program; there certainly would not be any recidivism measures because the entire class is serving life sentences. Stateville had no business allowing this to be started in the first place." *Id.* On April 5, Adamson received an email from Nicholson stating that Nicholson had been informed there would not be another debate program until an analysis of Stateville's core programs was completed, and that Burlet's current class was scheduled to end April 24. PSOF ¶ 36. Adamson forwarded this to Burlet, who responded: "Lol. Satan is finally putting up a fight. Gotta love it when God makes him feel like he has a chance." Ex. 12 to PSOF 1, ECF No. 105-12.

*Dr. Bazile-Sawyer and evidence-based programming at IDOC*

Dr. Bazile-Sawyer became Chief of Programs in November 2017. DSOF ¶ 66. At that time, then-Governor Rauner had introduced an initiative to reduce recidivism in the state by twenty percent. *Id*. ¶ 67. In furtherance of that mission, a Programs Committee, which Bazile-Sawyer chaired, was created to assess ongoing and potential new programming. *Id*. ¶¶ 68-69. The Programs Committee developed an application designed to evaluate how programs addressed

11

recidivism risk, including whether or not the program was "evidence-based"—that is, shown through studies to have specific outcomes such as reducing recidivism. *Id.* ¶¶ 70-71. Bazile-Sawyer estimated that the application was put into effect in the spring of 2018. Bazile-Sawyer Tr. 22:1-8, Ex. 19 to DSOF, ECF No. 98-19. Bazile-Sawyer also testified, however, that programming did not have to reduce recidivism in order to be "evidence-based," and Taylor testified that some activities constituted "quality of life" programming for certain IDOC populations, and that those programs could continue even if they were not evidence-based. PSOF ¶¶ 11-12.

After Taylor gave Burlet Bazile-Sawyer's contact information in early April 2018, Bazile-Sawyer received a request from Burlet, through Taylor, to reenact the March 21 debate and have it videotaped. DSOF ¶ 73. At some point in April—exactly when is disputed—Burlet and Bazile-Sawyer spoke on the phone. Bazile-Sawyer testified that during that conversation, she and Burlet discussed concluding the class on April 24, 2018, and that she described the new application process to Burlet. Bazile-Sawyer Tr. 82:1-24. Bazile-Sawyer also testified that she had her assistant send an application to Burlet, but that she "never saw" a completed application. *Id.* at 90:15-91:8.

Burlet disputes this account. In a sworn declaration, she asserts that she never agreed with Dr. Bazile-Sawyer on an end date for her program, that Bazile-Sawyer never told her she needed to fill out an application to secure renewal of the debate program, and that neither Bazile-Sawyer nor her assistant sent her an application form. Burlet Decl. ¶¶ 3-5, Ex. 1 to PSOF, ECF No. 105-1. Burlet recalls only being told, at some point between April 5 and April 10, that the class, as constituted with that particular group of students, would have to end, and testified that Adamson told her she could continue on with a new group of students and didn't need to do anything to

renew the class. PSOF ¶¶ 46-47. In fact, around this time, Burlet made plans for the Stateville debate team to engage in a competitive debate against Wiley College's debate team. PSOF ¶ 49.

On April 10, 2018, Burlet reached out to Taylor to request a meeting, DSOF ¶ 78. They met on April 16. *Id*. ¶ 79. During that meeting, Taylor told Burlet that many classes at Stateville were being discontinued because they were not shown to reduce recidivism rates, and that all Stateville classes were scheduled to end on April 24, not just the debate class. *Id*. ¶ 80. Taylor also provided Burlet with a list of individuals within IDOC who she should work with to schedule future debate events. *Id*. ¶ 81. Burlet expressed frustration to Taylor that Hess had been unresponsive to her inquiries about videotaping the reenactment of the debate, and Taylor told Burlet she would talk to Hess about it. *Id*. ¶ 82. Taylor told Burlet that if the members of the debate team memorialized their personal stories on video tape, it could help in reducing violence in Chicago. PSOF ¶ 51. Burlet testified, and the defendants dispute, that Taylor also indicated that she preferred that the class would debate something other than parole. *Id*. ¶ 50. Taylor testified that during this meeting, Burlet also asked if Taylor knew a certain individual in the governor's office. Taylor Tr. 81:23–82:6.

The next day, Burlet emailed the general counsel to the governor's office, informing her that Taylor had denied her request to bring a video camera into Stateville to tape the debate reenactment, and asking her if she would contact IDOC and tell them she would like to be there for a recording of the debate. Ex. 15 to PSOF 2, ECF No. 105-15; Taylor Tr. 81:23-82:6. The email made its way to IDOC legal counsel, and then to Taylor, who wrote to counsel, Bazile-Sawyer, and Hess: "I purposely stayed in Chicago on Monday to meet with Ms. Burlet. I informed her that IDOC [rather than Burlet's videographer] will be doing the taping in the interest of supporting the City of Chicago to reduce the violence so her email is not truthful. . . . She was cautioned about

13

the siloed communications; she is smarter than me clearly. . . . It is clear she will not adhere to guidance given to her within IDOC so Anita [Bazile-Sawyer] will be setting up a[n] internal conference call to discuss our actions with Ms. Burlet moving forward." Ex. 15 to PSOF 1.

*April 26, 2018 debate reenactment*

On April 20, 2018, Taylor, Baldwin, Bazile-Sawyer, Funk, and other IDOC officials met to discuss the debate class and apparently agreed to allow Burlet to videotape a debate reenactment. PSOF ¶ 55. That day, however, Bazile-Sawyer, Taylor, and others discussed over email an interview Burlet had done with WGN regarding the debate program; members of the debate class were also apparently interviewed. Ex. 24 to DSOF 1-2, ECF No. 98-24; PSOF ¶¶ 57-58.

Bazile-Sawyer had concerns with the story. It identified Burlet as the "Stateville debate coach," rather than a volunteer, which Bazile-Sawyer felt was a misrepresentation of Burlet's role. DSOF ¶ 88. Bazile-Sawyer also testified that as of April 20, she believed Burlet knew the debate class would be ending on April 24 (which Burlet disputes) and was troubled by how the interview seemed to suggest that Burlet had a much larger agenda for the program, in spite of the nearing end date,[5] and how the class members "were kind of being used as tokens in the middle . . . to keep this group going." Bazile-Sawyer Tr. 95:8–96:2, 108:6-19. Around this time, Bazile-Sawyer also became aware that Burlet was receiving funding for the debate class, which had not been disclosed to IDOC. DSOF ¶ 88.[6] Bazile-Sawyer felt IDOC should have known that Burlet was potentially profiting from the program and how the program was being funded.[7] Taylor also had

---

[5] Burlet asserts that the interview was actually filmed in February 2018. PSOF ¶ 58.

[6] Burlet established the Justice Debate League in 2017, after she had been conducting a similar debate program at IDOC's IYC Warrenville. Burlet Tr. 26:17-24. It was funded through individual donations and fundraisers. *Id*. at 30:18-19.

[7] It is not clear from the record whether or not Burlet was actually required to disclose her funding to IDOC as a new volunteer. During her testimony, Bazile-Sawyer described a process for how grant funding was approved at IDOC and noted that the new volunteer program application

concerns, testifying: "This looks like a policy shift, you know, something to promote this legislative agenda. It's not about a class or an activity to reduce recidivism or be an evidence-based program. That's what this was about." PSOF ¶ 57.

Bazile-Sawyer emailed Baldwin, Taylor, Hess, and another IDOC administrator, responding to the interview link: "I have grave concerns about this volunteers [sic] actions and intent!" Ex. 24 to DSOF 1. Regardless, the group agreed to continue with filming the debate reenactment on April 26. *Id*. Taylor wrote: "[W]e will film the debate reenactment on April 26th. I think we should also inform Rep. Mayfield that this debate class terminates on April 24th so she may want to reconsider her visit. . . . I cannot view the Facebook comments [on the interview]; but I can imagine the content." *Id*. Bazile-Sawyer replied, writing that she had contacted Burlet that morning and informed her that the class would conclude on April 24 and that the reenactment would be taped on April 26. *Id*.

But by April 23, the event had been cancelled. PSOF ¶ 59. Bazile-Sawyer testified that, apparently after she called Burlet on April 20, the decision was made by the executive team that the event should be canceled because of the ongoing concerns around Burlet and the program. Bazile-Sawyer Tr. 149:12–150:2. Taylor testified that "something occurred" that caused them to reverse course, but she could not remember what. PSOF ¶ 60. In confirming the debate had been canceled, Nicholson told Bazile-Sawyer that a stop order against Burlet had been issued. Ex. 32 to DSOF. Bazile-Sawyer described it as "protocol" for a stop order—a mechanism used by IDOC to prevent individuals from entering their facilities—to be entered against any instructor whose class ends. Bazile-Sawyer Tr. 152:7-16. However, other testimony contradicts that. *See* Funk Tr. 24:15-

---

required disclosure of any funding. Bazile-Sawyer Tr. 101:12-24, 103:6-23. However, she could not say whether volunteers who started programs prior to that application process (as it seems Burlet had done) would have been asked about funding. *Id*. at 105:6–106:4.

24, Ex. 27 to DSOF, ECF No. 98-27 (Chief of Operations Sandra Funk testifying that a stop order would not always be issued when a volunteer was no longer needed at the facility).

*The April 26, 2018 IDOC Advisory Board Meeting*

On April 26, Burlet attended an IDOC Advisory Board meeting at the Kewanee Re-Entry Center. DSOF ¶ 92. The IDOC Advisory Board is appointed by the governor to advise the Director of IDOC on policy matters and programs, and its meetings are open to the public. *Id*. ¶¶ 93-94. That day, Baldwin, Taylor, and Funk were present, as well as IDOC Chief of Programs Alyssa Williams-Schafer and others. *Id*. ¶ 95. At the end of the meeting, Burlet addressed the room, stating that she came as a messenger from God to deliver a message: "Lady Justice is on Illinois' doorstep. There is time to repent, but it is short. She is already knocking." *Id*. ¶ 96. She also directed the attendees to read the Book of Jonah. *Id*. Both Funk and Williams-Schafer found Burlet's comments to be "out of place," "disturbing," and "threatening," and Williams-Schafer filed an IDOC Incident Report. *Id*. ¶ 97. Williams-Schafer testified during her deposition that Burlet was "pointing" at the members of the IDOC executive staff. Williams-Schafer Tr. 33:8-11, Ex. 26 to DSOF, ECF No. 98-26. Defendant Baldwin recalled Burlet quoting scripture about retribution. Baldwin Tr. 41:5-13, Ex. 8 to PSOF, ECF No. 105-8. After the meeting, Funk and other IDOC officials discussed Burlet's behavior, and decided that a stop order should be issued against her. DSOF ¶¶ 100-102. On April 27, Funk submitted a stop order against Burlet. *Id*. ¶ 103. It is not clear from the record whether this was necessary in light of the stop order entered by Nicholson the previous day; the evening prior, on April 26, Burlet had arrived at IYC Warrenville, another IDOC facility where Burlet ran a debate program, and was not permitted inside. PSOF ¶ 75.

16

*Burlet's conduct since April 2018*

In May 2018, Burlet delivered an "Open Letter to Governor Rauner from the Stateville Debate Team" to the governor's office in Chicago, critical of IDOC's actions with respect to the debate team. DSOF ¶ 104. Defendants dispute the accuracy of the allegations in that letter. *Id*. ¶ 105. After delivering the letter, Burlet held a press conference, which garnered media attention. *Id*. at ¶ 109. After the press conference, a reporter from National Public Radio questioned defendant Baldwin about the debate class and its discontinuance. Compl. ¶ 64. Baldwin stated to the reporter: "[T]his was about somebody who chose not to follow basic corrections safety and security practices. And that cannot happen in an institution." *Id*. ¶ 65.

As of 2021, Burlet continued to work as a debate coach at Wheaton College, and as the operations manager and campaign strategy manager for an organization called Parole Illinois, which involves educating the public about the Illinois parole system and discussing it with legislators. DSOF ¶¶ 110-111. Burlet's non-profit organization, the Justice Debate League, experienced a decline in contributions after the cancellation of the Stateville debate and Burlet's ban from IDOC facilities, and because of the cancellation of the Stateville and IYC Warrenville programs, lost two of its most high-profile programs. PSOF ¶¶ 82-84.

While she is no longer permitted to volunteer at IDOC facilities, she was permitted by defendant Baldwin to visit Stateville in December 2018 to meet with some of the men who had been in her debate class. DSOF ¶ 112.

## ANALYSIS

Burlet claims that the defendants' actions with respect to her debate class and the stop order entered against her constitute viewpoint discrimination in violation of the First Amendment and a deprivation of her occupational liberty interest without due process in violation of the Fourteenth

Amendment. The defendants argue that Burlet has not produced evidence sufficient to prove viewpoint discrimination, that the actions taken with respect to her debate class and events were justified both by institutional security concerns and IDOC's prerogative to prioritize certain types of programming over others, and that Burlet has no protected liberty interest in conducting debate classes at IDOC facilities. The defendants also argue they are shielded by qualified immunity as to Burlet's First Amendment claims, and that Burlet has not shown that either defendant was personally involved in the decisions to discontinue the debate class or to issue a stop order against her.

Because it serves as the foundation for several other of Burlet's legal theories, the Court assesses the parties' First Amendment arguments first.

I.     **First Amendment Violations**

In their motion for summary judgment, the defendants raise arguments similar to those they raised in their motion to dismiss—primarily, that Burlet does not have a First Amendment right to teach a debate class in a correctional facility, or even a right to enter one. In ruling on the defendants' motion to dismiss, the Court held that while Burlet may not have a protected First Amendment right to teach her debate class at Stateville, her ability to do so constituted a government "benefit" that could not be withheld "on a basis that infringes . . . constitutionally protected interests—especially . . . freedom of speech." Mem. Op. & Order 8, ECF No. 48 (quoting *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 535 (7th Cir. 2006) (cleaned up)). The Court ruled that Burlet's complaint plausibly alleged that the defendants cancelled her debate programs and barred her from IDOC facilities because they disagreed with her views on parole, which is textbook viewpoint discrimination in contravention of the First Amendment. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that

18

the government may not regulate speech based on its substantive content of the message it conveys. . . . Discrimination against speech because of its message is presumed to be unconstitutional.") At that stage of the case, the Court found that Burlet had adequately alleged viewpoint discrimination and declined to find that IDOC's actions, even if they infringed Burlet's constitutional rights, were justified as "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). That was in part because the defendants' claim that the decision to ban Burlet from IDOC facilities was related to security concerns merely set up a "fact dispute about why the debate program was terminated" which would "have to be resolved after discovery by means of a trial." Mem. Op. & Order 10.

In assessing the defendants' motion for summary judgment, however, the Court has the benefit of a more fully developed record. In ruling on the motion, the Court must construe that record in the light most favorable to the non-moving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Summary judgment is appropriate only when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," such that "no reasonable factfinder could decide for" the non-movant. Fed. R. Civ. P. 56(a); *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019).

a. Viewpoint Discrimination

The defendants argue that IDOC made the decision to shut down Burlet's debate activities for neutral, administrative reasons unrelated to the topic being debated. They point primarily to Burlet's alleged failure to apply to renew the course, IDOC's focus on evidence-based programming, and security concerns based on Burlet's discomfiting behavior at the April 26 Advisory Board meeting. Burlet responds by highlighting various statements made by defendant

Taylor which Burlet argues betray a disapproval of the parole reform topic and suggest a prejudicial motive for the discontinuance of Burlet's class and her ban from IDOC facilities.

The problem for Burlet is that it is not enough to show that Taylor disagreed with her or the class members' views of parole reform, or even that Taylor would have preferred the debate class speak about something else in in front of legislators. Burlet must show some evidence that would allow a reasonable factfinder to conclude that IDOC suppressed her speech *because* of her "specific motivating ideology or [] opinion or perspective." *Rosenberger*, 515 U.S. at 829. And the overwhelming weight of the evidence shows that Taylor and other IDOC officials put an end to Burlet's debate activities and barred her from IDOC facilities not because of Burlet's views on parole reform, or because of the parole reform topic at all, but because of Burlet herself.

The defendants focus on the decisions to (1) discontinue Burlet's debate class and planned future events and (2) issue a stop order against Burlet. But Burlet argues that her claim is "based on a broader course of conduct by Defendants over time designed to prevent Plaintiff from exercising her First Amendment rights," including "statements and threats Defendant Taylor made to Plaintiff and her class, comments made on other dates designed to chill Plaintiff's speech, the cancellation of Plaintiff's program, the reversal of IDOC's commitment to videotape a debate reenactment, the cancellation of that debate reenactment, the cancellation of a competitive debate with Wiley College, and the statewide ban preventing Plaintiff from entering any IDOC facility." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") 9, ECF No. 106. That argument is confusing, though, because the record does not indicate that the defendants made any "statements," "threats," or "comments" to Burlet that actually succeeded in chilling her speech. Even accepting Burlet's version of Taylor's April 3 visit to the debate class as true, for example, it does not appear that Taylor's comments affected Burlet's speech at all; she emailed Adamson and Nicholson the

next day to request the videotaped reenactment Taylor had denied the day before. "A plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III." *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012). The only "concrete and particularized chilling effect[s]" Burlet has alleged such that she has standing to bring this claim are the discontinuance of her debate class, the cancellation of its planned events, and her ban from IDOC facilities—not any apprehension she may have experienced as a result of "comments" or "statements." *Id*.

Focusing on the specific actions taken by IDOC that shut down Burlet's debate activities, the Court finds no evidence of viewpoint discrimination as a motive. To the contrary, the topic of the original debate in December, and the reenactment in March, was parole reform, and there is no evidence that any IDOC or Stateville official objected to that topic for those debates. Rather, the record establishes growing concerns over time not with the topic of the debates but with Burlet's refusal to take no for an answer. There is a clear pattern: IDOC largely accommodating Burlet's vision for her events, but with some restriction, cap, or caveat that Burlet would attribute to improper motives on the part of IDOC officials and disregard by seeking the answers she wanted from another source. When told she could invite as many legislators as she liked to the March 21 debate, but had to limit the number of additional guests, Burlet went around Pfister and Lane to Simon to attempt to secure the number of attendees she wanted. When told by Taylor she would have to wait to videotape a reenactment of the debate until after the legislative session had ended, Burlet emailed Adamson and Nicholson asking to videotape a reenactment in three weeks. When told by Taylor she could not bring her own videographer in to film the reenactment, Burlet emailed the general counsel to the governor's office to ask for her intervention. This pattern was compounded by the discovery that Burlet was receiving previously undisclosed funding for her

21

volunteer work and communicating with media about the future of the debate program at Stateville without the knowledge of IDOC officials.[8]

In fact, it remains somewhat unclear from the record what Burlet's views on parole are, and how Taylor or Baldwin's views might differ. It is undisputed that Burlet's *class* debated the establishment of a parole system in Illinois; Burlet's complaint indicates that "[m]embers of the class were in agreement that Illinois should provide opportunities for prisoners with long and/or life sentences an opportunity for parole." Compl. ¶ 19. Burlet also testified that as part of her current work for Parole Illinois, she "educate[s] people about the fact that most people in the Illinois prison system don't have access to parole." Burlet Dep. 23:23-24:1. Taylor expressed her view that a parole system already does exist in Illinois, although perhaps with restrictions with which Burlet or the debaters might take issue. Baldwin's view on the subject is a mystery; the only insights in the record into his position are his statement over email that "the idea of a debate about PRB/parole would be very interesting"—again, hardly indicative of disapproval—and his recollection during his deposition that certain members of the Prison Review Board believed that "Illinois already has a parole board; it's . . . just called something else." Baldwin Dep. 90:2-10.

Burlet points to several statements made by defendant Taylor indicating that she disagreed with Burlet's view of parole reform, wanted the debate class to choose another topic, and wanted the Illinois legislature focused on her legislative priorities rather than parole reform. Again, it does not matter whether or not Taylor disagreed with the class's take on parole reform, told legislators her views, or wanted legislators to have IDOC's "perspective."[9] Taylor is an IDOC official, and

---

[8] Nicholson apparently was aware of the WGN interview at the time it occurred. PSOF ¶ 58.

[9] It is disputed whether or not Taylor said anything to Representative Mayfield at the March 21 debate about parole reform, and for the reasons set forth herein, the dispute is not material.

IDOC is entitled to determine its legislative agenda. Telling Burlet that she could host a second reenactment for legislators (*i.e.,* a third debate) on the topic of parole reform, but only after the legislative session ended and the General Assembly had considered IDOC's request for supplemental appropriations hardly constitutes viewpoint discrimination. IDOC ultimately *did* allow Burlet to schedule the reenactment for April, notwithstanding the status of the legislative session, so any grievance related to the potential delay is moot. Burlet suggests that Taylor's approval of a videotaped reenactment was tied to or contingent on her desire to focus the topic on reducing violence. But Taylor testified that she did not change the debate topic during her April 16 meeting with Burlet, and Burlet does not assert that she did. Further, Taylor's observation that having the class members' personal stories—which apparently had been shared to an extent at the March 21 debate—memorialized on video could be impactful and reduce violence in no way indicates she intended for the class to debate a different topic. Burlet also points to Taylor's statement over email that she could not view the online comments on Burlet's WGN interview but could "imagine the content" as indicative of Taylor's bias motive in shutting the event down. But having concerns over the public perception of Burlet's interview—an interview which Taylor and other IDOC officials did not know had occurred—is not the same as stifling Burlet's speech. Taylor wrote in that same email that the April 26 event *would* go forward; it was not until later that the decision was made to cancel the event altogether. Finally, Taylor's testimony regarding Burlet "pushing a policy agenda" related to her concerns about the class's overall purpose. Taylor testified: "[I]s this really about pushing a policy agenda? Or is it really about teaching these guys to debate? . . . Is it going to rotate subjects? Is it going to rotate participants?" Taylor Dep. 123:9-12. IDOC prioritizes evidence-based programming that benefits the people incarcerated in its facilities. The discovery that a volunteer may be using an activity as a public platform to

promote their own policy goal is, regardless of the policy goal, of understandable concern to IDOC officials whose chief programming concern is the enrichment and rehabilitation of inmates.

In sum, the Court sees no evidence in the undisputed record that the defendants discontinued Burlet's debate activities and banned her from its facilities because of the debate class's focus on parole reform or because of Burlet's views on parole reform. Burlet has not set forth evidence sufficient to convince a reasonable factfinder that Taylor or Baldwin's actions constituted viewpoint discrimination.

### b. Application of *Turner* and Qualified Immunity

Having found that Burlet has failed to establish viewpoint discrimination, the Court must next determine if she has established any constitutional violation at all. The standard for assessing the constitutionality of prison regulations is derived from *Turner v. Safley*: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89; *see also Decker v. Sireveld*, 109 F. 4th 975, 979 (7th Cir. 2024). The standard applies to prison regulations that affect the rights of both prisoners and non-prisoners like employees or visitors. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (applying *Turner* standard to claims of inmates' friends and family members regarding visitor policy); *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989) (applying *Turner* standard to claim of publishers of material sent to federal correctional facilities); *Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995) (applying *Turner* standard to claim brought by jail guard).

The defendants argue, as they did in their motion to dismiss, that *Turner* is inapplicable to Burlet's claims because she does not have the constitutional right to enter a prison facility in the first place. In its denial of the defendants' motion to dismiss, the Court rejected that argument, ruling that even if Burlet did not have the "right" to enter Stateville and teach a debate class there,

denying her the ability to do so because of her views on parole would still constitute a First Amendment violation because the government "may not deny a benefit to a person on a basis that infringes . . . constitutionally protected interests." *Mosely*, 434 F.3d at 535 (alteration in original) (quotation marks omitted). But the defendants are right that it is only necessary to apply the *Turner* test to the regulation at issue if it has been established that the regulation infringes the plaintiff's constitutional rights. At that point, the task is to assess whether the restriction of the protected right is justified in light of the unique needs of a correctional facility. *See Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019) ("[T]he correct application of the *Turner* test begins with the basic premise that there is a right being impinged.").

Further, if the defendants' actions did not violate any clearly established First Amendment right of Burlet, the defendants are entitled to qualified immunity on Burlet's First Amendment counts, and the Court may not need to reach the *Turner* test at all.[10] "An official is entitled to qualified immunity for conduct that does not clearly violate established statutory or constitutional rights of which a reasonable person would have known." *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015) (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1987). Whether or not qualified immunity protects an official is a two-part inquiry which asks if the plaintiff has alleged the deprivation of a constitutional right and if that constitutional right "was clearly established at the time and under the circumstances presented." *Beaman*, 776 F.3d at 508. The plaintiff "bears the burden of establishing the existence

---

[10] The defendants have argued they are entitled to qualified immunity as to Burlet's First Amendment counts but have not raised the defense as to her due process, conspiracy, and failure to intervene counts.

of the allegedly clearly established constitutional right." *Olson v. Cross*, 714 F. Supp. 3d 1034, 1048 (N.D. Ill. 2024) (quotation marks omitted).

A plaintiff can show that a right is "clearly established" by either pointing to "a clearly analogous case establishing the right to be free from the conduct at issue," or by showing that "the conduct was so egregious that no reasonable person could have believed that it would not violate established rights." *Beaman*, 776 F.3d at 508 (quotation marks omitted). Burlet has done neither. She articulates, in her response brief, two types of expression which she asserts are clearly protected by the First Amendment: (1) communication with prisoners, and (2) association with prisoners.[11] Burlet supports the first with cases involving claims brought by non-prisoners who wished to communicate, in writing, with prisoners. *See, e.g.*, *Thornburgh*, 490 U.S. at 407 (publishers whose material was subject to warden's review and rejection had constitutional right to reach out to "those on the inside" (quotation marks omitted)). Indeed, "non-prisoners do … have a First Amendment right to correspond with prisoners." *Rowe v. Shake*, 196 F.3d 778, 783 (7th Cir. 1999). But Burlet has not alleged that the defendants are preventing her from corresponding with Stateville prisoners. Her grievance is that she cannot conduct her debate class and related activities *at* Stateville or any other IDOC facility. Fundamentally, she alleges interference with her right to associate with IDOC inmates (the second right she flags). *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (recognizing right to freedom of association).

---

[11] The defendants argue that Burlet has no First Amendment right to enter a prison, and that she is therefore asserting a "third party" First Amendment claim on behalf of the debate class members—a claim which she does not have standing to bring. The Court does not construe Burlet's complaint that way. Burlet's grievance is that she cannot teach her debate class at Stateville anymore. That is, she can no longer communicate, face-to-face, with the members of the debate class at Stateville. That is a "personal and individual" injury sufficiently particularized to Burlet for purposes of her standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Whether that injury amounts to a constitutional violation is a different question, addressed herein.

"Freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131. Prisoners themselves have the right to receive visits from family. *See Easterling v. Thurmer*, 880 F.3d 319, 323 (7th Cir. 2018) ("[P]rison officials may violate the Constitution by permanently or arbitrarily denying an inmate visits with family members in disregard of the factors described in *Turner* and *Overton*.") However, that right is far from absolute; if a limitation on a prisoner's right to receive visitors "bear[s] a rational relation to legitimate penological interests," it passes constitutional muster. *Overton*, 539 U.S. at 132. But the right of non-prisoners, particularly non-relatives to prisoners, to visit correctional facilities is much murkier—and certainly not "clearly established" for purposes of a qualified immunity analysis. Burlet has not pointed to a "clearly analogous case" establishing her right to associate, face-to-face, with inmates at Stateville, and the Seventh Circuit has suggested no such right exists. In *Bilka v. Farrey*, a friend of an inmate who had smuggled him contraband and was thereafter banned from his visitor list alleged the ban infringed on her right to intimate association with her friend. 447 F. App'x 742, 743 (7th Cir. 2011). The court observed: "[W]e have not recognized that [the] right [to association] extends to someone who wants to visit a non-relative in prison." *Id*. at 744.[12] While unpublished, *Bilka* highlights the problem Burlet faces. In a footnote, she briefly argues that other courts have "implicitly" rejected the idea that non-relatives have no right to association with prisoners, but as support offers only *Thurman v. Unknown Cook County Sheriff Employees*, another unpublished,

---

[12] Underscoring how limited the "right" of non-prisoners to have face-to-face contact with prisoners is, in *Pell v. Procunier*, the Supreme Court held that even members of the press do not have a constitutional right to visit, face-to-face, with any inmate they choose. 417 U.S. 817, 834 (1974) ("[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public."); *see also Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir. 1987) (plaintiff legal advocacy group and its employees "failed in their burden to show there was a clearly established constitutional right of access to a prison experiencing a threat to its security in order to effectuate [their] first and fifth amendment rights").

non-binding decision involving a claim brought by a pre-trial detainee who alleged he was arbitrarily denied phone calls, pen and paper, and visits while in custody at a hospital. No. 18-cv-02720, 2018 WL 5315208, at *7 (N.D. Ill. Oct. 26, 2018). *Thurman* does not support Burlet's contention that she—not a relative, but a volunteer—has a constitutional right to associate with Stateville's residents inside the facility.

The Court therefore finds that the defendants are entitled to qualified immunity as to Burlet's First Amendment claims because the constitutional right asserted by Burlet has not been clearly established by any binding case law. Nor is the defendants' conduct—barring a volunteer from teaching debate at IDOC facilities—so egregious that a reasonable person would think it violated a constitutional right.

      c.  *Turner* factors

As Burlet points out, qualified immunity protects the defendants from monetary liability, but not from Burlet's requested injunctive relief. *See Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012) ("[T]he defense of qualified immunity does not protect defendants from an action for injunctive relief."). That is of no matter here, however, because even if Burlet's right to enter IDOC facilities and teach debate classes there was clearly established (though, again, it is not) and qualified immunity did not apply, Burlet's First Amendment claims would still fail because the defendants' actions were justified under *Turner. Turner* sets forth four factors that "inform the constitutional validity of a prison regulation: (1) the existence of a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;' (2) whether 'alternative means of exercising the [constitutional right] remain open;' (3) 'the impact accommodation of the asserted constitutional right will have on guards and other

inmates, and on the allocation of resources generally;' and (4) the existence of 'ready alternatives' to the challenged regulation." *Decker*, 109 F.4th at 979 (quoting *Turner*, 482 U.S. at 89-90).

On the first factor, courts are deferential in assessing the legitimacy of the interests articulated by correctional authorities: "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132; *see also Keeney*, 57 F.3d at 581 ("As long as the concerns expressed by correctional authorities are plausible, and the burden that a challenged regulation of jail or prison security places on protected rights a light or moderate one, the courts should not interfere."). The party challenging the regulation bears the burden of disproving its validity. *See Overton*, 539 U.S. at 132. Further, "[t]he four factors are all important, but the first one can act as a threshold factor regardless [of] which way it cuts." *Singer v. Raemisch*, 593 F.3d 529, 543 (7th Cir. 2010); *see also Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) ("Where . . . there is only minimal evidence suggesting a prison's regulation is irrational, running through each factor at length is unnecessary.").

The defendants argue that decisions regarding IDOC programming, and who is permitted to enter IDOC facilities, are "both well within the realm of maintenance of order and security at the Stateville facility." Mem. in Supp. Of Mot. for Summ, J. 17-18, ECF No. 97. They point to Burlet's alleged failure to apply to renew the program, and to her behavior at the Advisory Board meeting as the reasons for the discontinuance of Burlet's debate class and her ban from IDOC facilities. Burlet argues these reasons are pretextual and that the defendants have failed to show a connection between their conduct toward her and any "concrete security concern." Pl.'s Opp. 15. Burlet also argues that the record shows the defendants invoking "a number of different,

inconsistent justifications for cancelling the program at the time," which, though not specifically argued by the defendants in their motion, are nonetheless "flimsy." *Id*. at 28. Those include IDOC's focus on "evidence-based programming" and Dr. Bazile-Sawyer's suggestion over email that the debate class needed to be discontinued due to "limited program space." *Id*.

The Court agrees with Burlet that the lack of renewal form and Advisory Board incident are, if not pretextual, then at least factually disputed given (1) Burlet's affidavit asserting that she was never told she needed to apply to renew the program, and (2) evidence showing a stop order against Burlet had been entered *before* the April 26 Advisory Board meeting, a fact which the defendants have not meaningfully clarified or disputed. Burlet is also correct that while *Turner* demands deference to IDOC officials' expertise, the test is not toothless, and "where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," the regulation cannot be sustained. *Turner*, 482 U.S. at 89-90.

Still, there is ample evidence in the record that Burlet's continued presence at Stateville presented administrative challenges, some related to security and some not. Those challenges led to and justified the decision to bar Burlet from IDOC facilities. The undisputed facts reflect the following. First, the demands Burlet made of IDOC officials in furtherance of her goals for the Stateville debate class strained Stateville's security operations. Relatedly, during her brief tenure as volunteer debate coach, Burlet demonstrated time and again that she would not abide by the instructions she received from Stateville and IDOC staff but would seek to undermine the authority of any staff member who resisted her demands. Further, IDOC had concerns about hosting a large number of public officials at one of their maximum-security facilities, and about allowing Burlet to bring in a videographer to film an event inside the facility. Those concerns strike the Court as reasonable as a matter of law. Protecting the safety of visitors to the facility is a legitimate

penological objective, *see Overton*, 539 U.S. at 133, and exercising control over how inmates and correctional facilities interact with the general public and the media fall well within the realm of "the province and professional expertise of corrections officials." *Pell*, 417 U.S. at 827 (rejecting inmates' First Amendment challenge to limitation on media interviews). That Burlet was flippant about, and non-cooperative in addressing, those security challenges understandably exacerbated IDOC's concerns. It is telling that Burlet acknowledged an "apathetic" attitude toward the warden's concerns about the March debate as Burlet envisioned it, and that the warden had to tell Burlet not to stroll the galleries while visiting Stateville. It is reasonable for a correctional facility to ban someone who demonstrates such indifference to security.[13]

Further, the Court sees no reason why IDOC should not have full discretion over the courses offered to the individuals incarcerated in its system. Burlet may poke holes in IDOC's prioritization of evidence-based programming; the record does suggest that IDOC would allow at least some non-evidence-based programming, for religious purposes and for offenders serving life sentences. But Burlet's course—or more specifically, her efforts to stage the same debate over and over again—was consuming a substantial amount of time and energy from IDOC officials. To the extent that the defendants and other IDOC executives believed the effort Burlet demanded of them was not worth it, particularly given their uneasiness about Burlet's funding and publicity motives, it was reasonable as a legal matter for them to discontinue Burlet's course and direct their efforts into other programming. *See Decker*, 104 F.4th at 981 (deferring to Bureau of Prisons' "assertion

---

[13] Having found the stop order entered against Burlet on April 25 justified, the dispute as to whether or not Burlet's speech at the April 26 Advisory Board meeting was protected under the First Amendment, and whether or not IDOC was justified in banning her from its facilities on the basis of that speech, is moot.

that providing [inmates with] electronic access to the full Federal Register would require it to divert significant time and resources that could otherwise be devoted to other tasks.").

Having found a "valid, rational connection" between the discontinuance of Burlet's debate class and her ban from IDOC facilities and IDOC's legitimate, penological concerns, the Court notes that the second factor under the *Turner* test—whether the plaintiff has an "alternative" means of exercising the purported constitutional right—also weighs in favor of the defendants. First, Burlet acknowledges that, in December 2018, defendant Baldwin permitted her to visit with the members of her debate class. Second, as discussed above, there is no indication Burlet is prohibited from corresponding with the class members in writing. Third, there is ample evidence that Burlet continues to advocate for parole reform through her work with Parole Illinois, and that she continues to coach debate at Wheaton College.

Burlet asserts that she has no alternative means of exercising her asserted constitutional right because she is unable to teach debate to incarcerated individuals while banned from IDOC facilities. Even setting aside the Court's view that Burlet has no First Amendment right to teach a class at a correctional facility, courts have found this second *Turner* factor satisfied even where the specific desired form of expression—both in terms of content and medium—is precluded. *See Sebolt v. Samuels*, 749 F. App'x 458, 460-61 (7th Cir. 2018) (plaintiff inmate prohibited from using prison email system could still "use the regular mail to obtain similar periodicals and the telephone to communicate with his attorney"); *Singer*, 593 F.3d at 539 (plaintiff prisoner complaining of prison regulation prohibiting him from playing Dungeons and Dragons game with other inmates "still [had] access to other allowable games, reading material, and leisure activities."); *Hammer v. Ashcroft*, 570 F.3d 798, 805 (7th Cir. 2009) (prohibition on face-to-face media interviews upheld in part because "free correspondence supplies the needed channel of

communication" and prisoners were also "free to file lawsuits."). The record indicates Burlet has multiple avenues through which to continue exercising her First Amendment rights; those are sufficient for purposes of *Turner*.

The third *Turner* factor asks what the impact would be, if the asserted right were to be accommodated, on the prison's personnel, inmates, and resources generally. Burlet argues that the impact on the men enrolled in her class was an extremely positive one; the defendants do not dispute that. However, the evidence suggests that were the debate class to be reinstated and Burlet once again allowed free access to IDOC facilities, the same concerns regarding security and resource allocation would emerge. The Court must defer to the defendants' expertise and judgment in those areas. Finally, Burlet argues that the defendants' actions were an "exaggerated response" because they "jumped straight to a statewide ban . . . without considering any accommodations or alternatives." Pl.'s Opp. 18. But Burlet does not offer any proposed accommodation or alternative short of the full relief she is seeking: a lift of the stop order and reinstatement of her debate class. Further, it is difficult to conceive of a partial accommodation in this case because the defendants have linked their valid security concerns to Burlet herself. The most appropriate accommodation is one the defendants have apparently already made—allowing Burlet to visit with the men from her debate class on a case-by-case, preauthorized basis.

In sum, Burlet has failed to set forth evidence sufficient to show that the defendants' actions with respect to her and her debate class constituted unconstitutional viewpoint discrimination, or otherwise violated her First Amendment rights. The defendants are therefore granted summary judgment as to Burlet's First Amendment and First Amendment retaliation counts.

## II.    Procedural Due Process

Burlet argues that when the defendants shut down her debate program and barred her from IDOC facilities, they deprived her of her liberty interest in her occupation without due process.

"A government employer infringes an employee's occupational liberty interest when, without constitutionally adequate process, it places the employee's good name, reputation, honor, or integrity at stake or imposes a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Dunn v. Schmitz*, 70 F.4th 379, 382 (7th Cir. 2023) (alteration in original) (quotation marks omitted). To succeed on an occupational liberty claim, an employee must prove that: (1) he was stigmatized by the employer's actions; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Id*. at 383 (quotation marks omitted).

Burlet was not provided with any process at all in the termination of her status as a volunteer and the defendants do not contend that she was. The defendants also do not dispute that defendant Baldwin stated in a media interview that Burlet "chose not to follow basic corrections safety and security practices."

As the defendants point out, the Court ruled that Baldwin's statement was not defamatory per se in dismissing Burlet's original defamation claim, because the statement "praised Burlet's underlying ability as a debate coach and cabined criticisms to her activity in the IDOC context." Mem. Op. & Order 15. Baldwin's statement merely conveyed that Burlet did not follow the expectations of IDOC officials in the course of her work in the prison; it did not cast aspersions on Burlet's "good name, reputation, honor, or integrity." *Dunn*, 70 F.4th at 382 (quotation marks omitted). In addition, under the stigma-plus test for occupational liberty interest claims, stigmatizing statements by an employer "must be false assertions of fact." *Strasburger v. Bd. of*

*Educ., Hardin Cnty. Comm. Unit Sch. Dist. 1*, 143 F.3d 351, 356 (7th Cir. 1998). The record shows that Burlet routinely disregarded the instructions of IDOC administrators, and the Court is therefore skeptical that Baldwin's statement was demonstrably false.

The main question for the analysis of Burlet's due process claim, however, is whether she had a constitutionally protected interest in her work in Illinois prisons in the first place. Burlet argues that due to the defendants' actions she is "unable to pursue her calling of prison debate instruction." Pl.'s Opp. 38. She further argues that even though IDOC did not pay her, her IDOC debate programs at Stateville and IYC Warrenville "were her job" because she received funding for them through donations to Justice Debate League, which in turn paid her salary. Pl.'s Opp. 38-39. Those donations have declined since the programs ended.

But the fact that Burlet received outside funding for her work in IDOC facilities does not change her fundamental status as a volunteer for IDOC, which knew nothing of Burlet's funding when she began her debate class. That status puts her in a very different position than a government employee whose position is affirmatively terminated. Burlet has not pointed to a case where a volunteer has successfully prevailed on a claim for a due process violation based on an occupational liberty interest. Nor does existing case law, to the Court's knowledge, suggest they could. *See Jungels v. Pierce*, 825 F.2d 1127, 1131 (7th Cir. 1987) (deprivation of liberty in violation of due process "does not reach a case where the employee is fired from a part-time, honorific job while retaining the employment that gives him his livelihood"; plaintiff may "find it impossible in the future to obtain an appointment as a part-time city commissioner, but, if so, we cannot believe that such a minor deprivation would be a deprivation of occupational liberty."); *Versarge v. Township of Clinton*, 984 F.2d 1359, 1371 (3d Cir. 1993) ("Courts that have addressed the constitutional requirements for a protected interest in reputation in a volunteer context have

refused to find such a protected interest where the plaintiff has failed to show lost opportunity for employment."). Indeed, the Supreme Court has held that the defendants' stigmatizing conduct must be accompanied by the loss or alteration of a right or status recognized by state law before the Due Process Clause is implicated. *Paul v. Davis,* 424 U.S. 693, 711–12 (1976) (defamation unaccompanied by any tangible loss of a right "vouchsafed . . . by the State" does not deprive an individual of a protected liberty interest). Such state-guaranteed rights include, for example, licensure for operating a vehicle or a children's day care center. *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013). Burlet has not shown how Illinois law protects her status as a volunteer for IDOC.

Further, "[s]uccess on an occupational liberty claim requires that the circumstances made it virtually impossible for [the plaintiff] to find a new position in his chosen profession." *Dunn*, 70 F.4th at 385 (second alteration in original) (quotation marks omitted). Even after the entry of the stop order, Burlet has found gainful employment at the non-profit Parole Illinois and as the debate coach at Wheaton College. Burlet complains that her "chosen" profession is teaching debate in prisons. But a plaintiff has a protected occupational liberty interest in employment broadly—not in a specific job. Where evidence shows that a plaintiff has secured comparable employment after their termination and the stigmatizing conduct of the defendants, that evidence significantly undercuts her claim of a liberty deprivation. *See Townsend v. Vallas*, 256 F.3d 661, 672 (7th Cir. 2001) (plaintiff swim instructor barred from employment with Chicago Public Schools continued to teach college swim classes and therefore could not demonstrate liberty deprivation); *Munson v. Friske*, 754 F.2d 683, 694 (7th Cir. 1985) (former county employee who later found work at a college and another full-time job had not shown the defendants violated his liberty interests).

In short, even assuming defendant Baldwin's statements were stigmatizing (and the Court is not convinced they were), they did not alter Burlet's legal status or prevent her from finding gainful work. The defendants are therefore granted summary judgment as to Burlet's procedural due process count.

### III.  Defendants' Liability

The defendants argue that neither defendant Baldwin or Taylor were personally involved in the decisions to discontinue Burlet's debate class and enter a stop order against her, and that they therefore cannot be held directly liable under § 1983 for constitutional violations. *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) ("Section 1983 creates liability only for a defendant's personal acts or decisions."). Having granted the defendants summary judgment as to Burlet's alleged constitutional violations, the Court need not rule on this particular issue, but will observe that the defendants' own testimony belies the idea that they were uninvolved in the decision to bar Burlet from IDOC facilities. Defendant Baldwin testified that he and the executive staff, including Taylor, collectively decided to end their relationship with Burlet. PSOF ¶ 67. Defendant Taylor also testified that she was involved in the decision and provided a verified interrogatory response indicating she was involved. PSOF ¶ 60. That sworn testimony alone, without any other record evidence, would create a triable issue of fact with respect to the defendants' involvement. *See Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) ("An official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.") (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)).

Burlet also argues that Taylor and Baldwin are liable under § 1983 for conspiracy and failure to intervene. But neither of those counts are stand-alone theories of liability; both require

an underlying constitutional violation to have occurred. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation . . . ."). Because the defendants have been granted summary judgment as to Burlet's First Amendment and procedural due process theories, they must also be granted summary judgment as to her failure to intervene and conspiracy theories.[14]

* * *

For the reasons detailed above, the defendants' motion for summary judgment is granted.

Date: February 21, 2025

John J. Tharp, Jr.
United States District Judge

---

[14] Having granted the defendants' motion for summary judgment in its entirety, the Court need not address the parties' arguments with respect to the propriety of injunctive relief under comity and federalism principles.

38